(No. 26769.—

CAROL DREGNE, Appellant, *vs.* THE FIVE CENT CAB COM-
PANY *et al.*—(YELLOW CAB COMPANY, Appellee.)

*Opinion filed January 21, 1943.*

HOPKINS, SUTTER, HALLS & DEWOLFE, (ALBERT L. HOPKINS, DONALD J. DEWOLFE, T. EUGENE FOSTER, and WILLIAM G. BLOOD, of counsel,) for appellant.

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, (HOWARD ELLIS, DAVID JACKER, CHARLES M. RUSH, and JOHN M. O'CONNOR, JR., of counsel,) for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

The plaintiff, Carol Dregne, brought an action in the circuit court of Cook county against the defendants, the Five Cent Cab Company, the Yellow Cab Company, the Chicago Yellow Cab Company, Inc., the trustee of the Chicago and Northwestern Railway Company, and the railway company itself, to recover damages for personal injuries sustained while riding as a passenger in a taxicab in Evanston. At the close of plaintiff's evidence, the Yellow Cab Company made a motion for a directed verdict, its motion was allowed, the jury returned a verdict, as directed, and judgment was rendered accordingly. Chicago Yellow Cab Company's motion for a directed verdict was likewise granted. The jury found the trustee of the railway company as well as the company not guilty, and judgment was rendered in favor of these defendants. A verdict for $7500 was returned in plaintiff's favor and against the Five Cent Cab Company, and judgment entered upon the verdict. Plaintiff has elected to abide by the judgments

rendered in favor of the Chicago Yellow Cab Company, Inc., the trustee of the railway company, and the company. Neither the Five Cent Cab Company nor plaintiff appealed from the judgment against the former. Plaintiff prosecuted an appeal to the Appellate Court for the First District, seeking a reversal of the judgment rendered in favor of the Yellow Cab Company and against her. The Appellate Court affirmed. (*Dregne* v. *Yellow Cab Company*, 313 Ill. App. 539.) We have granted leave to appeal, and the record is before us for a further review.

By her complaint, plaintiff alleged that she was a passenger for hire in a taxicab owned and operated by the Five Cent Cab Company, the Yellow Cab Company and the Chicago Yellow Cab Company, Inc. The Yellow Cab Company answered, denying that plaintiff was a passenger for hire in any cab owned, operated or controlled by it at the time and place of the accident. Admittedly, the cab in which plaintiff was riding did not purport to be owned by the Yellow Cab Company and was not operated by one of its employees. Plaintiff contends, however, that the Yellow Cab Company controlled the Five Cent Cab Company. In short, she insists that the Yellow Cab Company so organized and controlled the Five Cent Cab Company and its affairs as to make the latter the instrumentality of the former. The Yellow Cab Company, to sustain the judgment, maintains that the evidence fails to prove, or even tend to prove, that it had any control over the operation of the Five Cent Cab Company. The issue thus made is whether plaintiff's evidence, construed most favorably to her, with all the reasonable inferences to be drawn from it, tends to prove her cause of action. If there is any evidence in the record tending to support her complaint, the judgment of the Appellate Court cannot stand. (*Shutan* v. *Bloomenthal*, 371 Ill. 244.) On the other hand, if there is a total failure to prove one or more of the necessary elements of her cause of action, as the Yellow Cab Com-

pany urges, the circuit court did not err in directing a verdict, and the Appellate Court properly affirmed. (*Beckett* v. *Woolworth Co.* 376 Ill. 470; *Darmody* v. *Kroger Grocery Co.* 362 id. 554.) A review of the evidence, to the extent necessary to determine the question thus presented, is required.

September 28, 1921, the Yellow Cab Company, hereinafter referred to as defendant, leased garage space in Evanston at the corner of Chicago avenue and Keeney street. The lease was to run twenty years at an annual rental of $11,000, payable in monthly installments of $966.67. As lessee, defendant agreed to construct a large garage and to deposit $11,000, a year's rental, in escrow as security for the payment of its rent. Defendant operated a fleet of 100 to 115 taxicabs from this garage from November 1, 1921, to July 1, 1935. During this period, the garage superintendent was William J. Hunter (deceased when the cause was tried) who had been employed by defendant from about 1920. Bernard J. Schoenfield was transferred from his employment with defendant in Chicago, to Evanston, in January, 1932, and made superintendent in charge of drivers. Mike Conway, a mechanic and shopman, was transferred to the Evanston garage in 1922. Competition for garage business in Evanston was keen and, owing to unfavorable financial operations, defendant planned to terminate the operation of its garage in Evanston. At this time, the summer of 1935, it was operating some taxicabs from its Davis-street station in Evanston, the cabs being dispatched from its Broadway garage in Chicago. Hunter, Schoenfield, Conway and all other employees of the Evanston garage were told they "could go out on their own." Hunter decided to organize his own taxicab company. To this end, he consulted with an attorney concerning the incorporation of the proposed business. Prior thereto, one of the defendant's officers had inquired of the attorney whether she would form a corporation for Hunter. The

attorney, now deceased, was a member of the law firm then representing defendant. Hunter gave general directions to the attorney with respect to the name of the new cab company and other provisions of the articles of incorporation, the details, of course, being left to his attorney. According to the latter, Hunter said, "Here is my chance to make something for myself. If I can manage this, I will probably be able to make some money."

July 1, 1935, a certificate of incorporation was issued by the Secretary of State to the Five Cent Cab Company. Hunter, Schoenfield, and Conway were the incorporators, 509-31 Keeney street, Evanston, was designated as the registered office, and Hunter was named the registered agent. The stated purposes were comprehensive. The authorized number of shares was 500, without par value, 250 of which were to be issued prior to the commencement of the business, and the consideration received was $2500. The estimated value of all the corporate property to be owned for the ensuing year was stated to be $12,500, and the gross amount of the business to be transacted during the following year was estimated at $60,000. The costs of incorporation and the attendant legal expenses were paid by the new Five Cent Cab Company. The corporate records disclose that Hunter subscribed and paid for 84 shares, Schoenfield 83, and Conway 83. No transfers were made and no additional shares were issued. These three men were the directors from the commencement of the corporate business until its termination. Hunter was made president, Schoenfield vice-president and treasurer, and Conway secretary. The attorney who organized the Five Cent Cab Company kept its corporate records and made minutes of directors' and stockholders' meetings. The meetings were quite naturally informal in character. As Conway observed: "In fact, they wasn't meetings, we just got together, that is about all," and Schoenfield declared: "These were no directors meetings; I tell you what they were. We

just sat together, and we said we were going to buy some cabs and such, and that was the directors' meetings. As far as I was concerned, I don't know, I didn't care, because I had a job; all I had was a job. As far as anything else was concerned, I didn't have anything to do with it." The informality of the corporate proceedings was not unusual. The bylaws, introduced in evidence, provided that the directors might waive notice of meetings, and that attendance by directors constituted a waiver and, further, that notice might be waived in writing either before or after a meeting, and that such a waiver was equivalent to notice. Again, the bylaws provided that a meeting of shareholders was valid if all shareholders were present. The corporate records, introduced in evidence, show that the directors and shareholders, namely, Hunter, Schoenfield and Conway, signed waivers of notice of all meetings.

Plaintiff directs attention to other testimony of Schoenfield and Conway. According to Schoenfield, Hunter informed him in 1935 that he was going to organize another company and that Hunter was the "boss." Conway testified to the same effect, stating that Hunter was "the boss from the beginning to the end;" that Hunter announced he was starting his own company; that he had bought some secondhand cabs to be used on the streets of Evanston; that he asked the witness to be his mechanic, and that "I didn't work for anybody but Hunter. He was my boss; I had to do what he told me." Salaries, the evidence discloses, were determined by Hunter. He himself received $50 a week, and Schoenfield and Conway $30 each. These salaries were paid by checks drawn on an Evanston bank where the Five Cent Cab Company maintained its bank account and, according to Schoenfield, "We did not receive any moneys or any considerations of any kind while we were at the Five Cent Cab Company from the Yellow Cab Company or Chicago Yellow Cab Company, not at all." A resolution of the board of directors required checks to

be signed by the treasurer and countersigned by either the president or secretary. Such provisions are quite common.

Referring to the lease, the new cab company agreed to assume and pay from July 1, 1935, to June 30, 1938, the rental of $11,000, provided in the lease of the garage. As a matter of fact this amount was not paid. The rent was reduced, and the Five Cent Cab Company paid about $300 a month. The Yellow Cab Company remained liable, by the terms of the lease, for the difference. Defendant did not actually sublet the premises or assign the lease to the Five Cent Cab Company. Subletting or assignment did not require the consent of the lessor, but defendant, the lessee, remained liable in either event.

June 30, 1935, defendant removed all its cabs from the Evanston garage. Conway went to the Racine-avenue garage of the defendant, in Chicago, the same evening and placed license plates on a fleet of used repainted cabs bearing the name "Five Cent Cab Company." Miscellaneous garage equipment was not removed. On July 1, 1935, the Five Cent Cab Company commenced operations. Part of the cabs used in its business was purchased from Roy F. Hale who was engaged in the business of selling second-hand cabs. An officer of defendant testified that Hale acted in its behalf "as a salesman of second-hand cabs, but not as an employee—not as a salaried employee." Other cabs were bought directly from defendant. In all instances, the purchases were secured by chattel mortgages on the cabs. The first mortgage recorded described property sold to Hale by defendant and by him, in turn, sold to Five Cent Cab Company. Further, the mortgagee, whether Hale or the defendant, was given the privilege of repossessing the property in the event of default of payments or if the mortgagee felt insecure. The number of cabs in operation between July, 1935, and February, 1939, varied from 30, at the commencement of operations, and a high of 55. The cabs bore no physical resemblance to yellow cabs, being

painted gray and red, the words "Five Cent" in large letters were painted on the doors, and an electric sign on the front at the top announced "Five Cent Cab Company." Their emblem was designed by Hunter. The cab company operated its cabs on a rental basis, renting them to anyone who had a chauffeur's license and an Evanston license. In the beginning, the company received $2.50 per shift, there being two shifts for each cab,—ten or eleven hours to each shift and, later, $2 for each shift. The drivers received no salary but kept the fares collected over and above the rental charge and the cost of the gas which they bought from the company. They were also subject to a charge of 25 cents a day until $25 had been accumulated to cover any property damage suffered. On March 18, 1937, Gerald Galvin was operating a cab in accordance with these arrangements. Plaintiff and two young-women friends entered the cab at a movie theater on Howard street, in Chicago, and directed the driver to take them to their homes in Evanston. The circumstances attending the accident need not be narrated. The negligence of the driver is not in controversy here. Nor are plaintiff's serious injuries in question.

Additional facts and circumstances merit mention. The Five Cent Cab Company paid social-security taxes on its own employees, numbering about eight. It made its own reports to the Secretary of State, as required by the Business Corporation Act. It carried its own insurance and, also, public-liability insurance at the time plaintiff was injured. The Five Cent Cab Company paid its own bills for telephone service. June 28, 1935, Hunter, then defendant's manager in Evanston, applied for a new telephone, with a new number, to be installed in the Evanston garage, and this telephone and number, together with two other numbers, was assigned to the Five Cent Cab Company. After July 1, 1935, defendant's listing in the telephone directory was continued in its own name and the

Evanston address of this garage was continued as an address of defendant. Also, after Juy 1, the Five Cent Cab Company handled calls for yellow cabs by relaying the calls to the yellow cab stands or garages.

After operating about four years, the Five Cent Cab Company became insolvent and, in January, 1939, ceased operations. Upon the termination of the Five Cent Cab Company's business, defendant repossessed cabs and meters sold by it, and miscellaneous equipment such as tools and license plates were delivered to defendant. The Jitney Cab Company immediately went into possession of the garage. Hunter obtained employment from defendant and was employed by it about a week or ten days. He then left defendant and went into a new business for himself. Schoenfield obtained employment with defendant in February, 1939, and was still employed by it at the time of the trial. Conway was employed by another cab company about three weeks before he applied to defendant for work. His application was rejected.

The narrow issue presented for decision is whether the facts recounted, construed most favorably to plaintiff, tend to prove that the Five Cent Cab Company was controlled by defendant, was, in fact, its instrumentality, and that control was exercised for the purpose of perpetrating fraud. The cab in which plaintiff was riding, when injured, was owned by the Five Cent Cab Company and was being operated by Galvin pursuant to a rental agreement between himself and the company. Galvin had no connection with defendant. The cab itself bore no resemblance to a yellow cab, and plaintiff could not have been misled by physical appearances when she hailed and used a Five Cent Cab Company cab. Her contention is, however, that the Five Cent Cab Company was a dummy corporation and that defendant was in a position of practical control. Fundamental principles of corporate law are applicable. A corporation is an entity separate and distinct from its share-

holders and, generally, from other corporations with which it may have relations. Indeed, the fact that the shareholders of two corporations are identical does not, necessarily, mean that the two corporations are to be considered as a single entity. Nor do the facts that one corporation owns shares in another and that they have mutual dealings require that they be regarded as one and the same corporation. Conversely, the legal fiction of distinct corporate existence will be disregarded when necessary to circumvent fraud or where the corporation is so organized and controlled, and its affairs so conducted, as to make it a mere instrumentality of another corporation. (*Superior Coal Co.* v. *Department of Finance,* 377 Ill. 282; *In re Watertown Paper Co.* 169 Fed. 252; *Berkey* v. *Third Avenue Railway Co.* 244 N. Y. 84; *Bergenthal* v. *State Garage & Trucking Co.* 179 Wis. 42.) In particular, it has been held that if the one corporation is merely a dummy or sham, the distinct corporate entity will be disregarded and the two corporations will be treated as one. *Wallace* v. *Tulsa Yellow Cab Taxi & Baggage Co.* 178 Okla. 15.

In the case at bar, defendant did not own any stock of the Five Cent Cab Company. Evidence that the latter was formed to accomplish fraud is wanting. Surely, plaintiff was not misled or defrauded. Defendant did not contract to assume the Five Cent Cab Company's obligations, and plaintiff does not so contend. Similarly, evidence is absent upon which to base an estoppel. Again, there is no evidence of an agency relationship between defendant and the Five Cent Cab Company. If liability is to be fastened upon defendant it must be because the Five Cent Cab Company was so organized and controlled and its affairs so conducted by defendant as to make it merely an instrumentality of the defendant corporation. The mere instrumentality of one corporation is not sufficient in and of itself to impose liability. (*Taylor* v. *Standard Gas & Electric Co.* 306 U. S. 307; *Certain-Teed Products Corp.* v. *Wallinger,* 89

Fed. (2d) 427; *Marr* v. *Postal Union Life Ins. Co.* 105 Pac. (2d) 649.) Referring to the so-called "instrumentality rule," the Supreme Court of the United States has observed, (*Taylor* v. *Standard Gas & Electric Co. supra,*) "It is not, properly speaking, a rule, but a convenient way of designating the application in particular circumstances of the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice." Again, it has been pertinently observed, (*Marr* v. *Postal Union Life Ins. Co. supra,*) "Before the courts will disregard the corporate entity of one corporation and treat it as the *alter ego* of another, even though the latter may own all the stock of the former, it must further appear that there is such a unity of interest and ownership that the individuality of the one corporation and the owner or owners of its stock has ceased, and further, that the observance of the fiction of separate existence would under the circumstances sanction a fraud or promote injustice. In other words, bad faith in one form or another must be shown before the court may disregard the fiction of separate corporate existence."

Although there is no direct evidence of fraud, plaintiff contends that the Five Cent Cab Company was organized by defendant in order to escape tort liability. Apart from the presence or absence of fraud, the burden rested upon plaintiff to prove that defendant operated and controlled the Five Cent Cab Company and exercised control over its employee, Galvin. Construing plaintiff's evidence most favorably to her, it appears that Hunter organized the Five Cent Cab Company for the purpose of providing employment for himself and his fellow employees when defendant decided to abandon operations from its garage in Evanston; that during its corporate life the Five Cent Cab Company functioned as a distinct and independent entity; that, in particular, its attorney kept its corporate records, it had its own pay roll, paid its own employees

directly, paid its own taxes, including social-security taxes, made separate reports to the corporation department of the office of the Secretary of State, carried its own insurance, including public liability, and maintained its own bank account, telephone and place of business. The personnel of the two corporations, including officers, directors and employees, was entirely different. The cabs used in the business were purchased by the Five Cent Cab Company from Hale, a dealer in secondhand cabs, and from defendant. So far as the evidence discloses, defendant controlled neither the cabs nor the drivers. Upon termination of the Five Cent Cab Company's business, defendant did not reoccupy the garage on Keeney street. Another and a different cab company occupied the premises. The foregoing facts fail to demonstrate that defendant controlled the Five Cent Cab Company in any manner.

Plaintiff places reliance, however, upon inferences or "factors" which, she asserts, may be reasonably drawn from the evidence. She claims that the Five Cent Cab Company was incorporated without sufficient capital and that, consequently, it was nothing but a shell or dummy for defendant. A concession that the Five Cent Cab Company was operating on a "shoe string" would not aid plaintiff. Under the Motor Vehicle Law, even a single individual may conduct a cab business, so long as he gives the required security. (Ill. Rev. Stat. 1941, chap. 95½, par. 59.) The evidence discloses that the cabs and meters purchased were secondhand equipment, bought "on time," and, in some instances, no down payment was required. The cabs were, in turn, leased to drivers, as previously narrated. From the rental charges, it appears that rentals would range between $3600 and $6600 a month. It cannot be said that the company's small capitalization was sufficient to constitute a fraud upon the general public. Furthermore, the fact that the Five Cent Cab Company carried its own liability insurance, the maximum liability of the insurer being $2500 for each cab, as required by the ap-

plicable statute, (Cahill's Stat. 1933, chap. 95a, par. 44) refutes plaintiff's asserted inference that the company was organized to aid defendant in evading tort liability. The fact that the insurance carrier has, itself, since become insolvent and been liquidated is immaterial so far as the question of good faith is concerned.

The argument that Schoenfield and Conway were dummy officers and directors is not persuasive. The evidence admits of but one conclusion as to domination, namely, that Hunter was the dominant factor behind the Five Cent Cab Company. Plaintiff's statement that defendant "caused the incorporation" of the Five Cent Cab Company is not supported by the evidence. The most shown is that the attorney for the Five Cent Cab Company was a member of the law firm representing defendant. The mere fact that the two corporations had the same attorney is not material. Plaintiff states that defendant supplied the physical assets of the Five Cent Cab Company. In the sense that part of the equipment of the Five Cent Cab Company was sold to it by defendant, plaintiff's statement is correct, but wholly beside the point. It is also true that a substantial portion of the Five Cent Cab Company's equipment was purchased from Hale. Chattel mortgages secured the purchases made, and when defaults in payments occurred the mortgages were foreclosed and the cabs repossessed conformably to the mortgages. The evidence cannot be distorted to support the inference that defendant caused the cessation of operations of the Five Cent Cab Company by repossessing cabs under its chattel mortgages. The Five Cent Cab Company became in arrears in its payments on the cabs and, in consequence, defendant foreclosed its mortgages. Nor do the facts warrant the alleged inference that defendant provided the garage space and paid the rent. Defendant merely subleased the premises, as it had a right to do, but it was still responsible for the rent under the lease. Again, plaintiff insists that it is "a fair inference," from the testimony, that defendant sup-

plied the original $2500 in cash capital. We deem it suffi-
cient to observe that her inference finds no support in the
evidence, and we are not warranted in imputing intent in
this regard.

Plaintiff stresses the fact that defendant continued to
list the garage in Evanston as one of its addresses and
maintained a telephone which the employees of the Five
Cent Cab Company serviced. It is true that employees of
the Five Cent Cab Company answered any calls for cabs
that came in on defendant's wire, and that such calls were
then referred to the Yellow Cab stand at defendant's Davis-
street station. The telephone company billed the two com-
panies separately for telephone service rendered on and after
August 26, 1935. Manifestly, the fact that defendant
maintained a separate telephone in the garage which the
Five Cent Cab Company's employees answered does not
prove that the company was an instrumentality of defend-
ant. It must be remembered that defendant was still oper-
ating in Evanston from the Davis-street station,—an ade-
quate reason for the telephone arrangement.

In our opinion, the evidence falls far short of establish-
ing, or tending to establish, that the Five Cent Cab Com-
pany was an instrumentality of defendant so as to make
the latter liable for the former's torts. It may well be that
defendant permitted, and assisted three of its former em-
ployees with, the formation of their own cab-company busi-
ness. This is not enough to charge defendant with liability
for the tortious acts of the Five Cent Cab Company and
the latter's employees. A comprehensive review of all the
evidence shows that defendant did not exercise control, in
any real sense, of the operations of the Five Cent Cab Com-
pany. Since the evidence, construed most favorably to
plaintiff, fails to sustain her cause of action, the circuit
court properly allowed defendant's motion to direct a ver-
dict in its favor.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*